# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

MARTHA LOU BRAUN, )
)
      Plaintiff, )
)
v. ) Case No. 09-CV-779-GKF-TLW
)
ST. PIUS X PARISH, an ecclesiastical )
organization, )
ST. PIUS X, a not for profit organization d/b/a )
ST. PIUS SCHOOL, )
MATTHEW VEREECKE, in his official capacity, )
)
      Defendants. )

## OPINION AND ORDER

This matter comes before the court upon the Motion for Summary Judgment (Dkt. #44) of the plaintiff Martha Lou Braun ("Braun"), and the Motion for Summary Judgment (Dkt. #47) of defendants St. Pius X Parish, St. Pius X, and Matthew Vereecke. The court evaluates the merits of these cross-motions separately.

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F3d 664, 670 (10th Cir. 1998). A

court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670. In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Defendant St. Pius X Parish (the "Parish") is a not-for-profit Catholic parish of the Roman Catholic Diocese of Tulsa, an ecclesiastical association. Defendant St. Pius X ("St. Pius") is a Catholic Church which operates St. Pius X School. Defendant Matthew Vereecke ("Vereecke") was the principal of St. Pius X School from approximately July 1, 2007, until June 30, 2010. Fr. Michael Knipe ("Fr. Knipe") is a Roman Catholic Priest who served as pastor of St. Pius from January 2005 until June 2011.

Plaintiff Martha Lou Braun ("Braun") was a fifth grade teacher at St. Pius during the 2007-2008 school year. She was teaching pursuant to a one-year, renewable contract, and had taught at St. Pius since 1988. Braun is not Catholic, she is Episcopalian.

In approximately April of each year, St. Pius' principal would recommend to the pastor whether or not a teacher's contract should be renewed. The pastor would then approve or reject

2

the principal's recommendations. In April of 2008, Vereecke recommended to Fr. Knipe that Braun's contract not be renewed, and Fr. Knipe approved that recommendation. On April 25, 2008, Vereecke informed Braun her contract would not be renewed. Braun was 63 years old at the time.

Braun brings three claims for relief. In her first claim she alleges that St. Pius discriminated against her based on her age in violation of the Age Discrimination in Employment Act. In her second claim Braun alleges that St. Pius discriminated against her based on her religion in violation of Title VII of the Civil Rights Act of 1964. In her third claim she alleges that St. Pius discriminated against her based upon age in violation of Oklahoma public policy, also known as a *Burk* tort. *See Burk v. K-Mart Corp.,* 770 P.2d 24 (Okla. 1989).

**I. Religious Discrimination**

The defendants argue they are entitled to summary judgment on Braun's religious discrimination claim because religious educational institutions may legally discriminate based on religion in the employment context. Braun concedes Section 702(a) of Title VII allows religious educational institutions to discriminate based upon religious grounds: "[t]his subchapter shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C.A. § 2000e-1(a). The Title VII exemption for "work connected with the carrying on . . . of its activities" "allows religious groups to discriminate based on religion with respect to the employment of individuals [who] perform work connected with their religious or secular activities." *Little v. St. Mary Magdalene Parish*, 739 F. Supp. 1003, 1005 (W.D. Pa. 1990); *Corp.*

*of Presiding Bishop v. Amos*, 483 U.S. 327 (1987). Because the exemption applies to employees with religious or secular duties, the court need not determine whether Braun's duties were religious. *See Id*. Braun argues St. Pius does not meet the definition of a religious organization or religious educational institution, and therefore does not benefit from the exemption. Both parties cite *LeBoon v. Lancaster Jewish Cmty. Ctr. Assoc*., 503 F.3d 217, 226 (3rd Cir. 2007) for a list of factors courts often apply to judge whether an organization fits within the exemption.

> "Over the years, courts have looked at the following factors: (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists."

*Id.* "[N]ot all factors will be relevant in all cases, and the weight given each factor may vary from case to case." *Id.* at 227.

St. Pius X School is operated by St. Pius X Catholic Church, a non-profit ecclesiastical organization organized under the Canon Law of the Roman Catholic Church. (Dkt. #47-1, ¶3). The school teaches many secular subjects, but also requires religious instruction for all students. Fr. Knipe, the pastor of the parish, supervises some school decisions such as whether or not to renew teachers' contracts. The St. Pius student handbook describes the school as "first and foremost a Catholic school [that] embraces the Catholic traditions of mass, personal prayer and stewardship." (Dkt. #47-6, p.2). The handbook lists students' responsibilities, the first of which is: "[t]o actively show your faith by: respecting the Eucharist, participating in the prayer and social life of the church school community, and treating classmates, teachers and visitors with

the respect they deserve." *Id.* at 6. Students are required to participate in daily prayer, and religious education is mandatory. St. Pius permits students of any faith to attend the school, but gives preference to members of the St. Pius X Parish and the Catholic faith.

Braun argues that St. Pius is not an "agent" of the Roman Catholic Diocese of Tulsa[1], and therefore cannot benefit from the exemption. This argument suggests that an agency relationship with the Diocese is necessary in order to qualify for the Title VII exemption. An agency relationship with an overarching religious body such as a diocese or conference is not a factor in the *LeBoon* list, nor does Braun point to other legal authority recognizing agency as a relevant factor.

Because St. Pius X School is operated by St. Pius Church, and because the factors above demonstrate St. Pius X School is a religious educational institution, the court concludes defendants qualify for the Title VII exemption for religious institutions. Defendants' motion for summary judgment on Braun's claim of religious discrimination is granted.

## II. The Ministerial Exemption

St. Pius contends the "ministerial exemption" insulates it from all Title VII discrimination suits, including Braun's claims for age discrimination. "The ministerial exception is judicial shorthand for two conclusions: the first is that the imposition of secular standards on a church's employment of its ministers will burden the free exercise of religion; the second, that the state's interest in eliminating employment discrimination is out-weighed by a church's constitutional right of autonomy in its own domain." *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. 1996). An employee need not be ordained to qualify for the ministerial

---

[1] Plaintiff's counsel informed the court at the October 13, 2011, hearing that when he filed this suit he also named the Diocese as a defendant, but dismissed the Diocese after receiving a Rule 11 "safe harbor" letter from counsel for the Diocese disclaiming an agency relationship.

exemption. *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1168 (4th Cir. 1985). "As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered 'clergy.'" *Id.* at 1169. "This approach necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church." *Id.*

A number of courts have held a principal of a parochial school fits within the ministerial exemption. *See, e.g., Sabatino v. St. Aloysius Parish*, 672 A.2d 217 (N.J. Super. Ct. App. Div. 1996). Defendants cite no authority, however, for the argument that a teacher at a parochial school is a minister, or qualifies for the ministerial exemption. Defendants conceded at the October 13, 2011, hearing that for Braun to benefit from the ministerial exemption, the court would need to extend the exemption beyond its current bounds. At the time of this order, "the overwhelming majority of courts that have considered the issue have held that parochial school teachers . . . who teach primarily secular subjects, do not classify as ministerial employees for purposes of the exception." *EEOC v. Hosanna-Tabor Evangelical Lutheran Church and School*, 597 F.3d 769, 778-79 (6th Cir. 2010) (string citation omitted), *cert granted*, 131 S.Ct. 1783 (2011).[2]

Defendants argue the Diocese of Tulsa and St. Pius "adopt and embrace the concept that teachers are ministers of the Catholic faith," but cite no evidence supporting the proposition that all teachers should be considered as ministers. It is difficult to conceive that Braun might properly be classified as a minister of the Catholic faith when she is not even a member of that faith. Although Braun's teaching contract required Braun to "teach and act in accordance with the precepts of the Catholic Church" and to "aid in the Christian formation of students,"

---

[2] The ministerial exemption is currently under review by the Supreme Court in *Hosanna-Tabor*.

defendants have not articulated specific responsibilities or actions that might be considered ministerial. The facts presented at summary judgment do not establish that Braun's position as a teacher of secular subjects qualifies for the ministerial exception. Braun did not teach religion or lead the students in prayer, and she is not Catholic. Defendants' motion for summary judgment is therefore denied with regard to the ministerial exemption.

### III. Age Discrimination

The parties have filed cross motions for summary judgment on Braun's Title VII and *Burk* tort[3] claims for age discrimination. The court turns first to defendants' motion for summary judgment. Under the *McDonnell Douglas* framework, a plaintiff who lacks direct evidence of intentional discrimination "bears the initial burden of establishing a prima facie case by a preponderance of the evidence." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000). For the purposes of their motion, defendants concede that Braun has established a *prima facie* case of age discrimination.

By establishing a *prima facie* case, "the plaintiff raises a rebuttable presumption that the defendant unlawfully discriminated against her." *EEOC,* 220 F.3d at 1191. "The burden of production then shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff." *Id.* "If the defendant is able to articulate a facially nondiscriminatory reason for the adverse employment action, the plaintiff can avoid summary judgment only if she can show that her '[membership in a protected class] was a determinative factor in the defendant's employment decision, or show the defendant's

---

[3] If the plaintiff fails to provide enough evidence to overcome a Title VII motion for summary judgment, "such a failure of proof is equally dispositive of both federal and *Burk* discrimination claims." *Brown v. Board of Regents*, 353 Fed. App'x 169, 173 (10th Cir. 2009); *Wilbanks v. Nordam Group, Inc.*, 2010 WL 4272581, *17 (N.D. Okla. Oct. 25, 2010).

explanation for its action was merely pretext.'" *Id.* (quoting *Atchley v. Nordam Group, Inc.*, 180 F.3d 1143, 1148-49 (10th Cir. 1999)). Braun concedes defendants have stated a legitimate, non-discriminatory reason for not renewing Braun's contract, but argues the reason for the decision is pretextual. (Dkt. #48, p.25).

To demonstrate pretext, the plaintiff must "show that a genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual." *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999).

> "A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false . . . (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances . . . or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff."

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). For St. Pius to be liable for age discrimination, age must have been a "but for" cause of Braun's termination. *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010). Moreover, age must have had a "determinative influence on the outcome." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). The court's "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999).

There is no genuine dispute that Fr. Knipe was responsible for the decision to accept or reject a recommendation not to renew a teacher's contract. (Dkt. #48-5, p.3). Fr. Knipe agreed that he exercised veto power over a recommendation not to renew a contract. *Id.* Even Vereecke concedes that he merely *recommended* non-renewal, he could not decide not to renew a contract on his own. (Dkt. #47-2, p.29). Fr. Knipe admits that "had Mr. Vereecke not made the

recommendation for Ms. Braun's non-renewal then she would have been renewed." (Dkt. #48-5, p.14). Braun argues that therefore Vereecke is a decision maker because he recommended non-renewal, and without his recommendation non-renewal would not have occurred. Fr. Knipe is clear, however, that his decision not to renew a contract "comes into effect with the input that is provided for that decision. At the same time, the decision was independent in the sense that as the pastor I am ultimately responsible for deciding to accept or not to accept." *Id.*[4] Fr. Knipe's position as sole ultimate decisionmaker is also demonstrated by the undisputed fact that on at least three occasions, he rejected Vereecke's recommendations of non-renewal. (Dkt. #47-2, p.29-30; 49-4, p.39). Therefore, there is no genuine issue as to the fact that Fr. Knipe was the ultimate decision maker with regard to non-renewal of teacher contracts.

St. Pius states that Braun's contract was not renewed due to concerns over five incidents that came to light in 2007-2008. The first incident involved an alleged statement Braun made to the parent of a special needs child that the child needed to have her medication changed. A dispute exists as to exactly what Braun said, but there is no dispute that Vereecke cautioned Braun about offering medical opinions in the written evaluation he gave to Braun in January, 2008. Vereecke wrote: "I have no problem with suggesting that a parent should seek tutoring help or begin the assessment process, but it is imperative (both legally and in terms of our community atmosphere) that you don't attempt to offer a pre-evaluation diagnosis." (Dkt. #47-7, p.6). In February, 2008, a parent, Todd Goldsmith,[5] called Vereecke with concerns about comments made by Braun to Goldsmith's wife Susan. Goldsmith reported that Braun told Susan that her fifth grade son "had something wrong with him" and that he "needs testing." Braun

---

[4] Braun points to Fr. Knipe's testimony that "[i]n a situation with school employees, I went very much on the recommendation of the principal" and "would have made an independent decision, but I tended to follow Matt's recommendations very closely." (Dkt. #48-5, p.13). Fr. Knipe's testimony came in response to a question about how he approached the renewal of contracts, not how he addressed a recommendation of non-renewal. Fr. Knipe never wavered from his position that he possessed the sole power to accept or deny a non-renewal recommendation.
[5] Goldsmith is also the Superintendent of Catholic Schools for the Diocese of Tulsa.

denies using those words in her conversation with Susan, but does not dispute that Goldsmith communicated his concerns over the incident to Vereecke. (Dkt. #47-8, p.2). Braun spoke to Vereecke about her conversation with Susan Goldsmith, but Braun denies that Vereecke reprimanded her over the conversation. Vereecke admits that whether a parent-teacher conversation is appropriate is context-dependant. (Dkt. #48-3, p.19-20).

The second incident St. Pius identifies is an alleged failure by Braun to follow through with a development plan for a student. Scott Garcia, the child's parent, reported that Braun established a plan to assist Garcia's son with spelling and vocabulary by sending home a list of words on Fridays in advance of the next week's lesson. This allowed the Garcias to make flash cards in order to practice for the spelling and vocabulary tests the following week. Garcia avers in an affidavit that Braun followed the plan "for a few weeks in accordance with the plan, but then she stopped providing the spelling/vocabulary words." (Dkt. #47-9, p.3). Braun disputes how many times she failed to provide the spelling/vocabulary words. Garcia believes that, as a result of Braun's failure to follow the plan, his son did poorly on a spelling/vocabulary test on February 29, 2008. *Id.* That same day, Braun failed to follow the plan and provide spelling/vocabulary words in advance. Garcia called Vereecke to complain, and Vereecke personally retrieved the spelling/vocabulary words from Braun and delivered the list of words to Garcia at a basketball tournament. By the time of Braun's evaluation on March 17, 2008, however, Vereecke stated that the situation with the Garcia child was "going well." (Dkt. #47-7, p.7).

The third incident St. Pius identifies is Braun's failure to utilize, and require children to utilize, organizational and communication tools. Vereecke warned Braun in her March evaluation: "For example, I know that some parents have mentioned concerns about the way

homework for the week is presented; instead of merely handing out the sheet (which is indeed sufficient for some students) you could have them staple the sheet into their planner." *Id.* On March 4, 2008, Vereecke met with the McCorkles, who had a child in Braun's class. The McCorkles advised Vereecke that Braun was not requiring the children in her class to use the daily planner they had been required to purchase. (Dkt. #47-11). The McCorkles also informed Vereecke that Braun did not respond to their emails or phone calls. The McCorkles described Braun as "dismissive and uncooperative" when they actually spoke with Braun regarding the daily planner. Following the meeting with Vereecke, the McCorkles noted "sporadic improvement," but advised Vereecke that Braun's efforts were still not what they desired and requested from her. The McCorkles believe the non-renewal of Braun's teaching contract was justified.

The fourth incident St. Pius identifies is the complaint received in April, 2008, from a parent, Nita Foley ("Foley"). Foley previously had three children go through Braun's class. The Foleys were long-time members of the St. Pius X Parish. Foley informed Vereecke that the reason their fourth child left St. Pius was because they did not wish to have him taught by Braun. Vereecke says his discussion with Foley was significant because Foley previously had children in Braun's class and was so concerned about the fourth child having Braun as a teacher that she pulled her fourth child from St. Pius. Braun argues the Foley child left because he would have had to repeat the fourth grade at St. Pius, but the statement she offers in support is inadmissible hearsay. (Dkt. #48-4, p.3). The hearsay statement is directly rebutted by Foley's affidavit in which she states her son passed fourth grade, and that "[a]ny statement that our son would have repeated the fourth grade if he had stayed at St. Pius is blatantly false." (Dkt. #49-5, p.4). Foley

states that her son "decided to leave the only school he had known to go to Jenks [a public school] so that he would not have to deal with Ms. Braun. My husband and I were not sorry." *Id*.

The fifth incident St. Pius identifies is the complaint of parents Michael and Cheri Hatfield in April, 2008. The Hatfields were members of the parish. They had an older child who had previously been taught by Braun, and a child in fourth grade who was scheduled to be in fifth grade during the 2008-2009 school year. The Hatfields told Vereecke they had concerns about their younger child being taught by Braun and were considering moving their child to another school in order to avoid having Braun as a teacher. Braun states she was not informed of the complaint. There is no genuine dispute as to the substance of the complaint.[6]

Defendants argue the decision not to renew Braun's contract benefits from a strong inference that the decision was not pretextual under the "same actor" inference. "[W]here 'the employee was hired and fired by the same person within a relatively short time span,' there is 'a strong inference that the employer's stated reason for acting against the employee is not pretextual.'" *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (citations omitted). The same actor inference has been applied when the hiring and firing occurred up to four years apart. *Id.* at fn.4 (string citation omitted). Even if the same actor inference applies, "'[t]he plaintiff still has the opportunity to present countervailing evidence of pretext,' . . . [the] 'same actor' evidence gives rise to an inference, rather than a presumption, that no discriminatory animus motivated the employer's actions.'" *Id.* at 1183 (citation omitted). At St. Pius, when the principal recommended that a teacher's contract be renewed, Fr. Knipe would

---

[6] Braun argues the existence and timing of this complaint and the Foley complaint are called into question by Vereecke's deposition testimony. Vereecke was asked: "[w]hat complaints did you receive between March 17th and April 25th, okay, that indicated to you that at that time frame after you sat down with Ms. Braun that her performance had not improved?" Vereecke answered: "[n]one." (Dkt. #48-3, p.34). Counsel's question inquires about complaints which indicated Braun had not improved in 2008. The question did not encompass complaints from parents like the Foleys and Hatfields who had no children in Braun's 2007-2008 class. Therefore, there is no genuine dispute of material fact as to the existence and timing of the Foley and Hatfield complaints.

rely on the recommendation, but would make an independent decision. (Dkt. #48-5, p.13). Fr. Knipe signed teacher contracts on behalf of St. Pius when they were renewed. (Dkt. #48-5, p.2-3; Dkt. #47-4, p.8).[7] Because Fr. Knipe had previously signed Braun's contract renewal twice, and because he was the ultimate decision maker with regards to the non-renewal of Braun's contract,[8] there is a strong inference that St. Pius' stated reasons for not renewing Braun's contract are not pretextual.[9]

Braun has not presented evidence of age discrimination with regard to Fr. Knipe. Nonetheless, she argues that principal Vereecke's alleged acts of age discrimination should be imputed to St. Pius. This theory of liability is known as "subordinate bias," "cat's paw," or "rubber stamp" liability. When a plaintiff's "pretext argument depends in part on a subordinate bias theory, [the plaintiff] must establish a genuine issue of material fact as to whether [the subordinate's] bias translated into discriminatory actions that caused [the plaintiff's] termination." *EEOC v. BCI Coca-Cola Bottling Co.,* 450 F.3d 476, 490 (10th Cir. 2006). "To prevail on a subordinate bias claim, a plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process. Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action." *Id.* at 487. "[A]n employer can avoid liability by conducting an independent investigation of the allegations against an employee . . . In that event, the employer has taken

---

[7] Braun argues the same actor inference cannot apply because Fr. Knipe admitted he would not decline to renew a contract unless a recommendation not to renew the contract was in front of him. (Dkt. #48-5, p.14). No recommendation not to renew Braun's contract was given to him prior to 2008. The fact that Fr. Knipe did not have an occasion to consider terminating Braun prior to 2008 does not change the fact that he renewed her contract for 2007-2008, and was ultimately responsible for deciding not to renew her contract for 2008-2009.

[8] The same actor inference cannot be applied to principal Vereecke's involvement for two reasons. First, he was not involved in the renewal of Braun's contract the previous year. Second, he did not make the ultimate decision not to renew Braun's contract.

[9] Even if the strong inference does not apply, this court concludes that defendants would be entitled to summary judgment.

care not to rely exclusively on the say-so of the biased subordinate, and the causal link is defeated." *Id.* at 488.

Braun presents no evidence that Fr. Knipe was a mere rubber stamp or cat's paw. On the contrary, Fr. Knipe overruled several of Vereecke's recommendations not to renew teacher contracts. Moreover, Fr. Knipe states that although he took Vereecke's input into account, the decision was independent. (Dkt. #48-5, p.14). Therefore, Braun has failed to show that Vereecke's alleged bias can be imputed to St. Pius on a theory of subordinate bias liability.

Based on the undisputed facts, the court holds Braun has failed to raise a genuine dispute as to whether the stated reasons for not renewing Braun's contract were false or pretextual. The defendants are entitled to a strong inference that Fr. Knipe did not act discriminatorily. The court holds that Fr. Knipe was the ultimate decision-maker and no reasonable factfinder could rationally find that the reasons provided for the non-renewal of Braun's contract were pretext for age discrimination. Defendants' motion for summary judgment is granted on Braun's first and third claims for relief, and Braun's motion for summary judgment is denied.

### IV. Alternative Holding

In the briefing on these motions, and at the October 13, 2011, hearing, Braun argued that: "the Plaintiff has always maintained there were two decision-makers in Braun's non-renewal. Vereecke made the formal recommendation, which was based on age. Knipe chose not to veto it, and this decision resulted from the fact that Braun was not Catholic and not a member of the Parish." (Dkt. #61, p.10). In the event the court has erred in concluding that Fr. Knipe was the ultimate decision-maker, the court enters the following alternative holding.

Braun argues that even if the facts underlying the five incidents discussed above are true, she has demonstrated pretext because Vereecke treated younger teachers differently than Braun. A plaintiff may demonstrate pretext by showing disparate application of either written or unwritten policies of the employer. *Kendrick*, 220 F.3d at 1230. "A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that [s]he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Id*. When a defendant fails to apply its own procedures to all employees, rather than merely failing to apply them to the plaintiff, the fact that a company failed to follow its own procedures does not suggest that the defendant's proffered reasons for its decision were pretextual. *Id.*, fn.9. "Title VII does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination *based upon* an employee's protected class characteristics." *Id.* at 1232 (emphasis in original) (citations omitted).

Braun argues that Vereecke deviated from the written procedures for teacher evaluation. The St. Pius handbook for teachers states teachers should be evaluated twice yearly and provided with the results of those evaluations. (Dkt. #44-18, p.20). Vereecke complied with the handbook by providing Braun with the results of his two evaluations. There is no requirement in the handbook that the principal meet with teachers personally or offer them an opportunity to improve prior to deciding not to renew the teacher's contract.

The student handbook at St. Pius provides a formalized grievance procedure for when a parent or student "disagrees with a ruling by a teacher." (Dkt. #48-21, p.28). The formalized grievance procedure outlined in the student handbook is inapplicable to Braun because none of the parental complaints against her involved a disagreement with any "ruling" she had made.

The student handbook further specifies that "[w]hen a policy or contract is violated, a written memo will be given to the teacher." *Id.* at 21. To the extent Braun was alleged to have violated a school policy regarding how to discuss medical conditions with parents, she was given written notice of that alleged violation in her teacher evaluation though no additional written memo was prepared. The remaining four complaints against Braun relate to her job performance and communication skills, not to any violation of a specific school policy or her teaching contract. Therefore, under the terms of the teacher handbook, no written memo was required.

Braun also argues that she can demonstrate pretext because Vereecke deviated from his own unwritten policy of how to deal with parent complaints. When asked to describe his process of dealing with parent complaints, Vereecke stated: "[g]enerally–and I have to speak generally here. Again, it would depend on the parent . . . I would usually receive the e-mail or phone call, I would have an informal conversation with the teacher to discuss what the parent had told me, and follow up from there with a formal meeting if I felt it was necessary." (Dkt. #48-3, p.6).

With regard to the first incident involving Braun's comments about student medical conditions, Vereecke communicated his concerns to Braun in her written evaluation, and spoke personally with her about the Goldsmiths' concerns. With regard to the second incident involving Braun's failure to send home vocabulary words with a student, Vereecke personally picked up the words from Braun but there is a dispute of fact as to whether he verbalized any criticism of Braun for failing to provide the student with the vocabulary words. With regard to the third incident involving communication with parents and failure to require students to use their planners, Vereecke formally notified Braun of the planner issue in her written evaluation. While disputes exist as to whether Vereecke spoke to Braun personally about the first three

incidents,[10] Braun was made aware of the problems through the written evaluation process and when Vereecke came to Braun's classroom to personally pick up the vocabulary words to bring to the McCorkles. The court cannot say that these facts give rise to any inference of age discrimination.

With regard to the fourth and fifth incidents involving parents who sought to avoid having their children taught by Braun, there is no evidence in the record of any procedure, formal or informal, for dealing with complaints against a teacher when the complaining individuals do not currently have a student in the teacher's class. Braun argues that she was treated differently than other, similarly situated teachers. The relevant comparison, however, is not between Braun and all other teachers at St. Pius, but between Braun and other teachers who were subject to complaints of "comparable seriousness." *Kendrick*, 220 F.3d at 1230. Braun has presented no evidence that any other teacher was subject to parent complaints of the severity and frequency she was. Braun was the only teacher about whom parents in the St. Pius X Parish complained with such intensity that they threatened to (and in one case, actually did) remove their children from St. Pius rather than have Braun teach them. These severe parent complaints about Braun occurred not once, but twice near the end of the 2007-2008 school year.[11] Vereecke describes

---

[10] Plaintiff's counsel argued at the October 13, 2011, hearing that Vereecke admitted he had no explanation for the difference in treatment between Braun and other teachers. The relevant portion of Vereecke's deposition provides:
Q: (Mr. Smolen): And you did not give [Braun] an opportunity to remedy [the McCorkle] problem?
A: (Vereecke): I would disagree that I didn't give her an opportunity to remedy it.
Q: How did you give her an opportunity to remedy it if you hadn't even told her about it?
A: I also can't answer that question.
(Dkt. #48-3, p.44). Nowhere in that exchange is differential treatment mentioned, much less conceded. Vereecke concedes he didn't meet personally with Braun about the McCorkle complaint, but as was discussed above he mentioned Braun's inadequate use of the planners in her written evaluation.

[11] Plaintiff's counsel argues that the complaints against Braun were not uniquely severe because another teacher, Chrissy Donatucci ("Donatucci"), also had a student leave her classroom during the 2007-2008 school year. Counsel neglects to mention that Donatucci was only the student's home room teacher, and the student had six other teachers for other subjects that year. Moreover, Vereecke makes clear the student did leave not due to teacher fault, the student left because the student's parents were given a choice to either withdraw the student voluntarily, or be kicked out. (Dkt. #61-3, p.7). No reasonable reading of the deposition can lead to the tortured conclusion that Donatucci and Braun were subject to complaints of similar severity.

how these complaints factored into the decision not to renew Braun's contract: "[u]ltimately, the climate at the school and the fear that more families like the Foleys and Hatfields were going to pull their kids, in conjunction with all the complaints that we had, led me to the decision that we needed to move in a different direction." (Dkt. #49-4, p.27-28).

The complaints against Braun were unique in scope and consequence. They were unique in scope because these parents did not merely cite a single disagreement with Braun; these parents did not want their children to have Braun as a teacher at all. The complaints were unique in consequence because these parents took or threatened to take the extraordinary step of removing their children from St. Pius to avoid having Braun as a teacher. Because the complaints against Braun were uniquely severe, there is no valid comparison between Braun and the other teachers on staff at St. Pius. Because the complaints occurred near the end of the year, St. Pius had to make its decision whether to renew Braun's contract shortly thereafter.

Braun argues she was treated differently than three other teachers: Donatucci, Roberson, and Blum (Dkt. #48, p.26). Braun cannot demonstrate disparate treatment, however, because Vereecke recommended that Donatucci, Roberson, and Blum's contracts not be renewed as well. (Dkt. #47-2, p.29-30; 49-4, p.39). Donatucci, Roberson, and Blum were all Catholic and members of the Parish, and Fr. Knipe overruled Vereecke's recommendation not to renew their contracts. Because of the uniquely serious complaints against Braun, and because Vereecke recommended non-renewal for all three of Braun's purported comparators, the court holds Braun has failed to show a difference in treatment by Vereecke between similarly situated teachers subject to complaints of comparable seriousness.

When analyzing the motions for summary judgment, the court notes that Braun has produced no evidence that Vereecke or Fr. Knipe ever made inappropriate comments, either

expressly or impliedly, about Braun's age or that they evaluated her capabilities based upon her age. Braun has produced no direct evidence of age discrimination, or of discriminatory attitudes regarding age by Vereecke or Fr. Knipe.

In the alternative to its ruling set forth in Section V, above, this court holds that in light of the uniquely serious parent complaints about Braun, the problem areas in her teaching identified by Vereecke, and the undisputed facts outlined above, no reasonable factfinder could rationally find that St. Pius' reasons for not renewing Braun's contract were pretextual.

## VII. Conclusion

WHEREFORE, for the reasons set forth above, the defendants' Motion for Summary Judgment is granted, and the plaintiff's Motion for Summary Judgment is denied.

DATED this 25th day of October, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma